May I please the court? I mean... The law is clear on the insurance policy must be interpreted to effectuate the expectations of the insured and interpreted against the insurer. Nevada law is clear on that point. The insurer created the ambiguity in the agreement. By using the word subcontractor, the sub... Wallchop purchased insurance. What other reason would they have purchased insurance for other than to provide for this situation which in fact developed? Wallchop is not a ready... Because somebody could slip and fall on their property, which is the usual reason people buy insurance. But, Your Honor, in the situation as to a concrete contractor in large projects such as this with 701 concrete slabs, individual slabs, I disagree that would be the only reason. I believe the reason is... But that's not what you asked. You asked what other reason would they have bought it for. I understand. And you're right. And you're right. But the other reason, and the more compelling reason, is if as a result of negligence by their subcontractor Nevada Ready Mix, then they will have indemnification from their insurance company for those cracks in that concrete, which is exactly what occurred here. The concrete cracked. It cracked because Nevada Ready Mix drove its 65,000 pound trucks over 701 separate dirt pads. In fact, Nevada Ready Mix did most of the work under Wallchop's contract. Counsel, in your view, how do you tell the difference between a supplier of materials and a subcontractor? In your opinion, what's the difference under Nevada law? Under Nevada law, I think the difference is... Nevada insurance law. Nevada insurance law, exactly. In Nevada insurance law, you have to look at the expectation of Wallchop in this situation. The expectation of Wallchop is that Wallchop contracted part of its contract with Nevada Ready Mix. Nevada Ready Mix is not a supplier of nails. They're not a supplier of bolts. They're not a supplier of lumber that was just dropped off the site. They did not just simply drop concrete off at the site sitting on the side. Well, how could you? It hardens in a big lump. I'm sorry? I'm not sure why the nature of the delivery mechanism turns a supplier of materials into a subcontractor. Well, there are many different factors, and the factors to consider as to a concrete supplier subcontractor such as Nevada Ready Mix is the following. They mixed the concrete. It was not just an off-the-shelf mix. They mixed the concrete. They provided the water. They delivered to the site. They had numerous drivers. But more than that, they actually, instead of putting the concrete in a pumper off to the side and then workers taking the concrete and putting it in the pads, they actually drove their trucks over 701 rather long, 30 to 70 foot long dirt pads, creating ruts behind the rails. Well, let's assume right now that you had a truck delivering nails and bolts, which you agree are simply materials, and they foolishly took their big heavy trucks everywhere and made these same ruts. I guess I don't understand what the fact of the harm that was done doesn't alter the nature of the relationship.  If the bolt deliverer or the nail deliverer, in fact, created that harm and it was subcontracted, the work was subcontracted by another party, that would also create a relationship. But Mark, doesn't your argument have to turn to the fact that these people actually poured concrete? I mean, it's not that they drove the trucks. I mean, as Judge Graber is saying, lots of people could drive trucks on the property. But it's that they did work on the project by pouring something from their truck directly onto the site, not just delivering it, onto the work, not onto the site, onto the actual product. It's more than that. It's more than that. Is that your best argument? Isn't everything else going to be repeated, going to be similar with regard to other material suppliers? I think that material suppliers, and we cite case authority, material supplier, when the steel was delivered and the steel was used in the structure, they were a subcontractor. There is provision for that, and that is a very compelling argument. But I think also compelling and more compelling in these facts in this case, and what's so unique to this case is that they actually did perform a large percentage of the contract. Right, not because they drove the trucks, but because they put the concrete on the platforms. And they created the ruts, and it was the ruts where the concrete, the rear wheels of a large 65,000-pound truck, between that and the chute where the concrete comes out, may be a matter of 10 feet. There is no physical possibility for anybody to smooth out these ruts. That's what's so unique to this case. But a $65,000 truck had delivered nails. You presumably wouldn't say it would lose, right? If the nails were delivered to the side of the project, that would be correct. Even if they weren't delivered to each individual platform, they're still just delivering nails. And if they did so negligently, then they did so negligently. As for the nails, yes. Right. But this is distinguishable. Because they're pouring concrete. Because they're pouring concrete and because of what they're doing and how they do it, their acts are more than just dropping something off at a site. Is it possible to deliver concrete and not pour it? It is possible to deliver concrete and put it in a pumper, which could have been to the side of the pads, and then with the hose go to pad and pour it that way. So it is distinguishable. Okay. I think that what has occurred here is somebody's judgment should be in favor of my clients. The district court should be reversed with directions to summarily adjudicate the issue of coverage in favor of OASIS and Trinum. This is the expectation of Walshaw entering into the contract from insurance. The word subcontractor is vague. They have the opportunity to interpret it, to try to interpret in this case is rather unique, and I don't believe that they're providing any interpretation by any of the authority that they've cited in their brief to support that. Okay. You've got about three minutes. Do you want to save it for rebuttal? I'm sorry? You have about three minutes. Would you like to save it for rebuttal? I will. Thank you. Okay. We'll hear from the other side. Good morning, Your Honors. Paul Loretto for United States Felony and Guarantee Company. May it please the Court, I'd just like to clarify one point that was made by the appellant. This pumper issue, if there was a pumper on the site, that was Walshaw's job to decide how they wanted the concrete delivered to the site. So if they wanted a pumper and didn't, based on the configuration of the site, and didn't want trucks driving on the site, then they could have arranged to have had a pumper. True, but I think what Judge Berzin asked is, is it possible to deliver concrete any other way than the way it was done here? And the reason that matters is that if it can only be delivered by trucks pouring it directly onto the site, then it's maybe more likely to be viewed as a material. And if it can be done one of two ways, one is to put it in a pumper and one is to drive it to the site and actually pour it, it's more likely to look like a subcontractor. Your big problem is that you're defending an insurance contract, and all ambiguities, particularly in terms of limiting coverage, must be construed against you under Nevada law. And it just strikes me as pretty obvious that this is arguably a contractor. She took ten people on the street and said, hey, look at the guy that's sitting there pouring concrete. Do you think he's a subcontractor? If they had an opinion at all, they'd say, yeah, that looks like a subcontractor to me. Isn't that a test in Nevada? Does that mean you lose? The test in Nevada is interpreting it from the standpoint of the insured. And the insured here is Walchop, and Walchop is a concrete contractor. In this case, he was the subcontractor to Reno. Walchop. If you hire a concrete contractor, one would think, including I think the contractor would think, that putting the concrete in the place where the concrete goes is part of what you're hiring the contractor to do. And if he is not going to do that but hire somebody else to do it, then he is, quote, subcontracting it. And that's different than buying nails or buying steel or buying anything else. He is a concrete subcontractor. That's what he's there to do is to build these platforms. And if somebody else is pouring the concrete on the platform, he's doing part of the job, is he not? Well, Walchop's job was to build the concrete pads. That's correct. Right. And that job entailed leveling the pads. But first he had to get there. First the concrete had to get there, had to get on the pad first. The concrete is just the material used to build the pad. Oh, yes. You have to prepare the surface. It gets from here to there and is poured onto the pad. Why isn't that part of the job of the person you're hiring to make the pads? Because it's just the material that the Walchop had to work with at the site. It's more than that. If the guy running the truck doesn't put in enough water or put in too much water or the weight in the truck, let it sit in the truck too long, or maybe the turning mechanism turns at the wrong rate, that stuff can go bad. It requires expertise. It requires knowledge of materials. You look at the temperature. You look at the – there's all sorts of stuff. I've seen those guys operate, and they are professionals. I couldn't do it, even if I knew how to operate a truck like that. There's a lot of stuff you need to know in order to be able to pour concrete. It just strikes me as entirely consistent with the idea that this is a professional doing a professional job, not just some schmo delivering a bunch of nails. Is that wrong? I think the fact that you're a professional doesn't necessarily convert them into a subcontractor. It helps quite a bit because anybody, the guy from UPS, and UPS is a great company and does a great job, but they drop it off. That's what they do. They bring the package. They drop it off. They don't know what's in it. They don't do anything with it except deliver it, whereas the guy who delivers concrete – I mean, really, it requires specialized knowledge, specialized expertise. You've got to make sure that the truck is lined up just right, that you don't let it sit there and let the concrete get too hard. I mean, it's just very complicated. Why isn't exactly a subcontractor kind of function? Because all of the testimony that was presented at the district court, and the district court carefully considered it, was that it was simply a situation where the truck driver just positioned the chutes. The truck driver and the cement truck constantly mixes the concrete. It's mixed at the plant. But don't they pour water in there all the time, and don't they take soundings on how the concrete is doing? I've seen them operate. There was no testimony to that effect. The only testimony was that if Walshop wanted water added, depending on the consistency, Walshop could decide to instruct the truck driver to add water. The truck driver is just a truck driver. Let's say they don't get paid, the guy who delivers the concrete doesn't get paid. Does he get a mechanic's lien? Can he put a mechanic's lien on the house? For the material. He can put a mechanic's lien on it, not for the labor. Can the guy who delivers nails put a mechanic's lien on the house? Or for the nails, he can put a mechanic's lien on it for his materials. You can put a mechanic's lien on it for materials or labor or both. Well, maybe they don't put it on it for labor, but there is labor involved. In other words, the labor is not simply dropping things off. They are putting not only material but labor into the actual job, right? Because if they had just dropped off the concrete and left, somebody else would have had to pour the concrete. But their labor wasn't taking over the contract that Walshop had because Walshop had the ultimate responsibility of finishing the path. That's always true of the general contractor. The general contractor always has the ultimate responsibility. He's just subcontracting part of the responsibility that he has, but he doesn't lose his responsibility. When you hire a general contractor and he subcontracts, you hold the general contractor responsible for whatever was supposed to be done. In the case of the general contractor, though, the sub actually does work. It finishes a product and does part of the main contract. For example, a general contractor who hires a plumber to put in the plumbing system, he doesn't do any of the work. Supervise the plumber? He may supervise him, but he doesn't do any of the work. Here, Walshop had every responsibility to do the paths. If you look at the contract between Walshop and Torino. He didn't pour the paths. He had somebody else pouring the concrete onto the paths. That's the whole point. The position is that he and the district court, I thought, analyzed it fairly well, is that that was basically a material type of operation. The actual preparing of the paths, the troweling of the concrete, that was all Walshop. Unquestioned material. I had a very hard time believing that this is something that, you know, reading all ambiguities against the insurer and the specific rule dealing with limitations. Limitations on liability have to be read narrowly. So not only do you read all ambiguities against the insurer, any ambiguity or any term that excludes coverage must be read narrowly. These are two rules of Nevada law, and I had a very hard time believing that the guy who's sitting there for hours pouring, you know, doing all that work is not a subcontractor or wouldn't be reasonably understood to be a subcontractor by somebody reading the contract. And the reason, Your Honor, is that he's a material man is because it's just material that he's supplying. He's not doing any of the work. He's not preparing the surface. He's not troweling the concrete. He's not deciding what kind of concrete goes in this particular project. He's simply delivering the concrete that Walshop ordered. He's placing it exactly where Walshop wanted it to be placed, and then Walshop has a responsibility once the concrete is there to finish it off, to trowel it. To do whatever is necessary. Putting it where the contractor says is always true of a subcontractor. The subcontractor always has to fit his work within the scope of the large project, and the person who says, you know, that's the part of the roof that he will, or where he will put the tiles, is the contractor. You know, put it over there, not over there. So somebody has to provide the scope of the work, and that's the contractor's job. That doesn't strike me as making him a material man. But if he poured the concrete on the street and said, here it is, you know, go ahead and take shovels and, you know, that sounds to me a lot more like a material man. Why don't I turn it over to my colleague here, Mr. Oh, your colleague. I didn't know you were splitting up. Well, your colleague has 44 seconds. May it please the court, Sean Hawley, for CGU Hawkeye, I will be brief. I think so. I'm gathering from the court's comments that it may be embarked on a kind of a slippery slope here. This is really analogous, I believe. A what? Slippery slope. Well, yes. This is really analogous, I believe, to a situation where, let's say, a painting contractor goes to a Home Depot and purchases paint to put on a building, on some walls. The painting subcontractor probably did the drywall and the underlayment texture as well. They get the paint from Home Depot. Home Depot, as you know, has rows and gallons of white paint. The white paint is then turned into a color based on the painting subcontractor's specifications and based on a standard book of colors. And Home Depot then delivered it and opened the can and put it on the wall under the direction of the painting contractor who would then smooth it out. Would they not be a subcontractor? Well, I think that what you're doing is overstating what Nevada Ready Mix did here. Nevada Ready Mix, well, if I might. It sounds exactly right. Well, no, if I might. What happened here was Walshop directed the trucks to a particular pad that was going to be poured. Then Walshop employees directed the chutes from the trucks. In other words, they were in control of the chutes when the pour was being made. They're the ones who placed the concrete, who actually directed the concrete to be poured in specific areas of the pads. And that is in the record on the excerpt page 144. That was the testimony of Mr. Thornton. Your Wal-Mart example in this case is Wal-Mart leaves the paint in the can. And the job of actually applying it to the location on the project then becomes of the guy who's doing the painting. Well, in this case. Let me finish. What happened here is they actually applied it. When they got done pouring the concrete, the concrete stayed there and dried and became part of the project at the location where it was poured. That's the big difference. No, and, Your Honor, I have to respectfully disagree with that. Because in this case, in this case, the concrete trucks are the paint cans. The driver of the concrete truck is in the truck when the pour is actually taking place. It's the Wal-Chomp employees that are controlling the shoots. Who pulls the lever to make the concrete truck go from this position to the pour position? Why don't you just tell me? No, that would be the truck driver. That's the truck driver's equipment. No question about it. Okay, and who pulls the lever that opens the chute that lets the concrete pour? Well, actually, according, that's unclear in the record. But according to Mr. Thornton, according to Mr. Thornton. You're a good guy. You've seen it done. It was Wal-Chomp employees. You always stop and look. I always stop and look and say, you know, so watch. It's great. It's always the truck driver. Well, if anybody touches that lever, that guy bites your hand off. Absolutely. But just the fact of pulling the lever, Your Honor, does not place the concrete on the pad. It's controlling the chute. It's gravity. That's right. That's the sub-current. I think your time's up. Thank you, Your Honor. You've got 10 minutes if you want to take it. Well, Your Honor, I think I know when not to speak, except there are two other issues that were raised in the appealee's brief that dealt with the issue of Montrose and the application. And I don't know if that is an issue. Montrose? Montrose, the application of the continuing property loss theory and whether or not that would be applied here. And my suggestion is that should be applied here with a direction on that. Additionally, the appealee raises another issue. You guys want a day to try to settle this case? Excuse me? We can defer submission for a day if you guys want to try to settle this case. Trying to settle this case has certainly always been a pleasure, Your Honor. You are here in the building, you know. I think this is a good case to settle. Want to try? I would love to, Your Honor. Counsel? You've heard us talk. This is a good thing. You know, if you need to, we have a very fine mediation team. You can ask the clerk's office to put you in touch with them. They're really very good. They can settle anything. You now know more. You've heard our questions, so you know what we're thinking. I don't know what we will do any more than you do, so, you know, you've heard what we're thinking. So I think this is a good place to try to mediate. We will defer submission for a week. If we hear nothing further from counsel or from mediators, we will submit the case and decide it. If you need more time at that point or something, then either you write to us and say defer submission further, or ask the mediators, if you're working with them, to ask us for more time, and they can do it internally, and we will be most generous. I appreciate that. May I ask a question? Does your case depend on adopting the Montrose rule? No, it does not. Montrose is merely a rule that applies to the relationship between the insurance companies and who ultimately will be paying. And I don't understand. There are multiple years of insurance. Right. And because of the multiple years of insurance, that is an issue. Is the reversal reliant on it, or is it a decision that Montrose can be made by the district court judge? No. However, the guidance of this court certainly is appreciated because the Montrose principle in the first-party situation has previously been adopted by Nevada, but in the third-party situation, in the day-to-day setting, it's being observed, but no court has yet adopted it in the third-party situation. I see. Okay. Thank you. Thank you very much. Thank you very much. We will defer submission for a week and then order the case submitted, unless we hear otherwise from the parties or the mediators.
judges: Kozinski, Graber, Berzon